## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

TRANSMAX PRODUCTIONS, LLC,

      Plaintiff,

v.

GREG SWARTZBERG and 448 RDA, LLC,

      Defendants.

Civil Action No.
1:19-cv-03568-SDG

## OPINION AND ORDER

This matter is before the Court on Defendants Greg Swartzberg and

448 RDA, LLC's ("RDA") motion to dismiss [ECF 16]. For the following reasons,

Defendants' motion is **GRANTED IN PART** and **DENIED IN PART**.

## I.  BACKGROUND

The following facts are treated as true for the purposes of this motion.[1]

Swartzberg is the owner and manager of RDA, a limited liability company

organized under the laws of Georgia.[2] Defendants are collectively the owners of

---

[1]  *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1274 (11th Cir. 1999) ("At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff.").

[2]  ECF 13, ¶¶ 5–6.

real property known as The Railyard—a 16-unit commercial development located in Atlanta, Georgia.[3]

On August 4, 2008, Plaintiff Transmax Productions, LLC—through its owner Christina Tran—entered into an agreement with Defendants to lease two suites at The Railyard (the "Lease").[4] The Lease permitted Transmax to operate an events facility and nightclub—known as Rain Night Club and Lounge (the "Business")—at the property.[5] The original term of the Lease was 36 months, but the parties later executed two amendments extending the Lease an additional 72 months, through July 31, 2017.[6]

In June 2016, Transmax notified Defendants that it intended to sell the Business and would need to assign the Lease to the purchaser.[7] Section 9 of the Lease provided: "Lessee [*i.e.*, Transmax] shall not, sublease or assign this [L]ease agreement without the prior written consent of the Lessor [*i.e.*, RDA], which shall not be unreasonably withheld or delayed."[8] Pursuant to this provision,

---

[3]   *Id*. ¶ 7.

[4]   *Id*. ¶¶ 4, 8; ECF 7-2 (Aug. 4, 2008 lease agreement).

[5]   ECF 13, ¶ 9.

[6]   *Id*. ¶ 10.

[7]   *Id*. ¶ 11.

[8]   ECF 7-2, at 10.

Defendants informed Transmax that they would need to meet and approve any potential buyer.[9]

Between July 2016 and August 2018, Transmax identified six parties—in the form of sole individuals, groups of individuals, and a limited liability company—interested in purchasing the Business and assuming its obligations under the Lease.[10] Despite receiving offers from each potential buyer, Defendants refused to approve assignment of the Lease, under the same terms, to any prospective purchaser.[11]

On several occasions, Defendants allegedly made derogatory remarks about the potential buyers' race.[12] For instance, Transmax alleges Defendants informed it that they did not want to rent the property to a Black tenant, or a tenant that primarily catered to Black clientele, because Defendants "don't like them" and "straight [B]lack people are ghetto and shoot up places."[13] Because of Defendants' refusal to approve assignment of the Lease, Transmax could not sell the Business.[14]

---

[9]    *Id. See also* ECF 7-2, at 10.

[10]   ECF 13, ¶¶ 14–47.

[11]   *Id.* ¶¶ 17, 22, 28–29, 33–36, 40–44, 46–47.

[12]   *Id.* ¶¶ 33–35, 42–43.

[13]   *Id.* ¶ 33.

[14]   *Id.* ¶¶ 81–85.

In June 2018, Transmax alleges Defendants speculated it was attempting to covertly sell the Business to a set of buyers—all of whom were Black—and began harassing and stalking Transmax and its employees.[15] On July 20, 2018, Transmax, through its legal counsel, sent a letter to Defendants informing them that Transmax believed it was a victim of discrimination.[16] In September 2018, Defendants prevented Transmax from hosting a Labor Day party in The Railyard's parking lot, despite previously approving the event in June.[17] Transmax alleges this culminated in Defendants retaliating against it by terminating the Lease and filing a dispossessory action against Transmax.[18]

Transmax initiated this action against Defendants on August 7, 2019.[19] On September 23, 2019, Transmax filed its Amended Complaint, asserting nine causes of action against both Defendants.[20] In Counts I and II, Transmax asserts claims under 42 U.S.C. § 1981 for the discriminatory and retaliatory refusal to make and enforce contracts (Count I) and § 1982 for the denial of property rights

---

[15]   *Id*. ¶¶ 48–50.

[16]   *Id*. ¶¶ 48, 65.

[17]   *Id*. ¶¶ 58–64.

[18]   *Id*. ¶¶ 65–66.

[19]   ECF 1.

[20]   ECF 13.

(Count II).[21] In Counts III–V, Transmax asserts independent breach of contract claims premised on Defendants' alleged failure to approve assignment of the Lease (Count III); failure to extend the Lease (Count IV); and violation of the right of quiet enjoyment and bad faith breach (Count V).[22] Counts VI–IX assert state law claims for unjust enrichment (Count VI); fraud (Count VII); tortious interference with contractual relationship (Count VIII); and tortious interference with business relationship (Count IX).[23] On October 3, 2019, Defendants filed the instant motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).[24] Transmax filed its response in opposition to Defendants' motion on October 17.[25] Defendants filed a reply in support of their motion on October 30.[26]

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires a pleading to contain a "short and plain statement of the claim showing that the pleader is entitled to relief." While this standard does not require "detailed factual allegations," the

---

[21]   *Id*. ¶¶ 68–78.

[22]   *Id*. ¶¶ 80–102.

[23]   *Id*. ¶¶ 103–134.

[24]   ECF 16.

[25]   ECF 18.

[26]   ECF 21.

Supreme Court has held that "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

To withstand a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 570). A complaint is plausible on its face when a plaintiff pleads sufficient factual content for the court to draw the reasonable inference that the defendant is liable for the conduct alleged. *Am. Dental Ass'n*, 605 F.3d at 1289 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. A complaint must also present sufficient facts to "'raise a reasonable expectation that discovery will reveal evidence' of the claim." *Am. Dental Ass'n*, 605 F.3d at 1289 (quoting *Twombly*, 550 U.S. at 556).

At the motion to dismiss stage, "all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1296

(11th Cir. 2011) (quoting *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1261 (11th Cir. 2006)). This principle, however, does not apply to legal conclusions. *Iqbal*, 556 U.S. at 678.

## III.   DISCUSSION

Defendants contend each Count in the Amended Complaint must be dismissed as a matter of law. The Court addresses Transmax's claims in turn.

### A.   Transmax's Constitutional Claims (Counts I and II)

In Counts I and II, Transmax asserts Defendants violated 42 U.S.C. §§ 1981 and 1982, respectively, for interfering with Transmax's ability to sell the Business and assign the Lease by discriminating against the potential buyers because of their race.

Section 1981 addresses racial discrimination in contractual relationships: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." *See also Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 961 (11th Cir. 1997) ("It is well-established that § 1981 is concerned with racial discrimination in the making and enforcement of contracts."). Section 1981 encompasses "all phases and incidents of the contractual relationship." *Rivers v. Roadway Exp., Inc.*, 511 U.S. 298, 302 (1994). Generally, the elements for a cause of

action under § 1981 are: "(1) that the plaintiff is a member of a racial minority; (2) that the defendant intended to discriminate on the basis of race; and (3) that the discrimination concerned one or more of the activities enumerated in the statute." *Kinnon v. Arcoub, Gopman & Assocs., Inc.*, 490 F.3d 886, 891 (11th Cir. 2007) (*citing Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1270 (11th Cir. 2004)). Section 1982 similarly addresses racial discrimination in property transactions. *See id.* ("All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."). A § 1982 claim arises "when a citizen is not allowed to acquire property . . . because of color." *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1016 (2020). *See also Long v. Aronov Realty Mgmt., Inc.*, 645 F. Supp. 2d 1008, 1023–24 (M.D. Ala. 2009) ("[T]he Supreme Court has broadly construed § 1982 to protect not merely the enforceability of property interests acquired by [B]lack citizens but also their right to *acquire* and use property on an equal basis with white citizens. . . . Section 1982 covers every racially motivated refusal to sell or rent.") (citing *City of Memphis v. Greene*, 451 U.S. 100, 120 (1981) (emphasis in original)).

Courts construe sections 1981 and 1982 in the same manner. *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 448 (2008) ("[T]he Court has construed §§ 1981 and 1982

alike because it has recognized the sister statutes' common language, origin, and purposes. Like § 1981, § 1982 traces its origin to § 1 of the Civil Rights Act of 1866."). The elements of a § 1982 claim are "parallel" to those required for a § 1981 claim: "A plaintiff must show the same first two elements, and interference with the rights or benefits connected with the ownership of property." *Long*, 645 F. Supp. 2d at 1017 (citing *CBOCS*, 553 U.S. at 448; *Daniels v. Dillard's, Inc.*, 373 F.3d 885, 887 (8th Cir. 2004); *Lawrence v. Courtyards at Deerwood Ass'n*, 318 F. Supp. 2d 1133, 1150 (S.D. Fla. 2004)). *See also Todd v. Ala. Power*, No. CIV.A. 09-0746-WS-N, 2010 WL 749334, at *3 (S.D. Ala. Mar. 1, 2010) ("The three elements Plaintiff must show to state a claim under 42 U.S.C. § 1982, mirror the elements for a cause of action under 42 U.S.C. § 1981, with the exception of the third element. These two statutes are considered 'sister' statutes, and courts have long construed them alike because of their common language, origin, and purposes."). As such, the Court will consider both of Transmax's constitutional claims in tandem for the purposes of this Order.

### i.   Transmax Cannot Maintain Its Constitutional Claims for Alleged Events that Occurred After July 31, 2017.

Transmax's constitutional claims are defined by the nature of the Lease.[27]

Transmax must "identify an impaired contractual relationship . . . under which [it] has rights." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006). This relationship "need not already exist"; the statutes protect "the would-be contractor along with those who already have made contracts." *Id*. Defendants may be liable when, "for racially motivated reasons, they prevented individuals who 'sought to enter into contractual relationships' from doing so." *Id.* (citing *Runyon v. McCrary*, 427 U.S. 160, 172 (1976)). Put another way, relief is available "when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so long as the

---

[27] Transmax does not attach the Lease or subsequent amendments to its Amended Complaint. Defendants attached these documents to their original motion to dismiss [ECF 7-2] and request the Court view them to resolve this motion. As a general rule, on a motion to dismiss pursuant to Rule 12(b)(6), if "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). However, "a document attached to the pleadings as an exhibit may be considered if it is central to the plaintiff's claim and the authenticity of the document is not challenged." *Adamson v. Poorter*, No. 06-15941, 2007 WL 2900576, at *2 (11th Cir. Oct. 4, 2007) (citations omitted). Since the Lease and two amendments are central to Transmax's claims, and their authenticity has not been challenged, the Court will consider them without converting Defendants' motion into one for summary judgment.

plaintiff has or would have rights under the existing or proposed contractual relationship." *Reddy v. Gilbert Med. Transcription Serv., Inc.*, 588 F. App'x 902, 904 (11th Cir. 2014) (citing *Domino's Pizza*, 546 U.S. at 476).

Transmax's constitutional claims are premised on its abridged rights under the Lease—not any potential contract that could have been formed between Defendants and a third-party buyer.[28] In other words, Transmax alleges Defendants' discriminatory actions impaired its ability to sell the Business and assign the Lease pursuant to its terms. As noted, the Lease was originally set to expire after 36 months; *i.e.*, August 2011.[29] The parties subsequently extended it until July 31, 2017.[30] Although Transmax alleges it repeatedly requested Defendants execute a third amendment to further extend the Lease—and performed certain actions in reliance on Defendants' promise to extend the Lease—it is undisputed the parties never came to a final agreement on a renewal or extension.[31] After July 31, 2017, the parties instead "verbally agreed" to a month-

---

28  *E.g.*, ECF 18, at 6 ("In this case, [Transmax] is the named party in the lease and [is] suing based on its own contractual rights. It is not acting as an agent for someone else's contracting.") (citations and punctuation omitted).

29  ECF 13, ¶ 10; ECF 7-2.

30  ECF 13, ¶ 10.

31  *Id*. ¶ 52.

to-month term, payable at the same rate for as long as Transmax leased the property.[32]

Georgia law is clear that a "tenant who stays on after the termination of the lease and pays rent with the permission of the landlord becomes a tenant at will." *Valiant Steel & Equip., Inc. v. Roadway Exp., Inc.*, 205 Ga. App. 237, 240 (1992) (citing *Ferguson v. Bank of the S.*, 164 Ga. App. 203, 205 (1982)). What is more, the "mere payment by the lessee and acceptance by the lessor of rentals after the expiration of the original lease does not effect a renewal, and the lessee [occupies] the status of a tenant at will." *Valiant Steel*, 205 Ga. App. at 240 (citing *Erquitt v. Solomon*, 135 Ga. App. 502, 504 (1975)). As such, Transmax became a tenant at will after July 31, 2017, when the Lease expired and the parties agreed to the monthly payment of rent.[33]

---

[32]  *Id.* ¶ 89.

[33]  Transmax also alleges that, beginning in April 2018, the parties came to a series of unidentified verbal agreements.[33] Transmax fails to provide any specific details of these agreements, most critically the allegedly agreed-upon term length. "Where no time is specified for the termination of a tenancy, the law construes it to be a tenancy at will." O.C.G.A. § 44-7-6. *See also Plank v. Bourdon*, 173 Ga. App. 391, 394 (1985) ("Where the parties have failed to reach full agreement on all terms of the lease and enter under a mere agreement for a future lease, they are tenants at will."). As such, these sparse allegations do not change the at-will nature of Transmax's tenancy after July 31, 2017.

Georgia law provides that a tenant at will has no rights in the subject property to assign or transfer to a third party. *Hayes v. City of Atlanta*, 1 Ga. App. 25, 25 (1907) ("It has been held, however, from ancient times, that a tenancy at will is not transferable or assignable."). *See also Drury v. Sec. State Bank*, 328 Ga. App. 39, 41 (2014) ("[T]he tenant at will holds by the landlord's permission. A tenant at will is always in by right, evidenced by permission, express or implied, of the landlord."); *Restatement (Second) of Property: Landlord & Tenant* § 15.1 (1977) ("[T]he tenancy at will can inherently exist only between the original parties. An attempt by the landlord or the tenant to transfer his interest under the tenancy at will passes nothing to the transferee. Furthermore, since such attempt manifests that the transferor no longer wills that the tenancy continue, the tenancy is terminated by an attempted transfer unless the transferee and the other party to the tenancy at will approve the continuation of the tenancy at will, in which case it becomes a new tenancy at will.").

Once Transmax became a tenant at will, it lost any rights in the property that could be assigned to a third party. It therefore cannot "identify an impaired contractual relationship . . . under which [it] has rights" after July 31, 2017. *McDonald*, 546 U.S. at 476. While Transmax points to a holdover provision in the Lease—which provides that, if Transmax "remains in possession after

expiration . . . of the Lease Term . . . all provisions of [the Lease] shall remain in effect"—this provision does not override the month-to-month rental arrangement agreed to by the parties or imbue Transmax with an assignable property right in contravention of Georgia law. In sum, Transmax cannot pursue claims against Defendants under §§ 1981 or 1982 after the Lease expired on July 31, 2017.

> ### ii. Transmax States a Plausible Claim as to the First and Second Buyers.

Transmax alleges that, prior to July 31, 2017, Defendants refused to approve assignment of the Lease to two sets of potential buyers because of their race. In July 2016, Transmax identified two individuals—both of whom were Black—interested in buying the Business and taking over the Lease to use it as an events facility (the "First Buyers").[34] Defendants met with the First Buyers, but subsequently informed Transmax they would not approve the assignment.[35] In July 2017, Transmax located another potential buyer—a Black woman—interested in buying the Business and operating a catering company (the "Second Buyer").[36] Defendants met with the Second Buyer, but again informed Transmax that they

---

[34]   *Id*. ¶¶ 14–15.

[35]   *Id*. ¶¶ 16–18. Defendants informed Transmax they would not approve assignment of the Lease to the First Buyers because they "didn't like the idea." [*Id*. ¶ 17.]

[36]   *Id*. ¶ 19–23.

would not approve the assignment.[37] Since these events are alleged to have occurred prior to July 31, 2017, Transmax possessed rights of assignability under the Lease.[38]

Defendants contend Transmax's claims as to the First and Second Buyers are nevertheless barred because: (1) Transmax lacks standing because it does not allege Defendants discriminated against Transmax due to its owner's race; (2) Transmax brought these claims outside the applicable statute of limitations; and (3) Transmax does not allege Defendants' racially motivated actions interfered with the existence of an actual agreement with any potential buyer.[39] For the reasons stated below, the Court finds none of these arguments persuasive.

---

[37] *Id*. ¶ 22. Like the First Buyers, Defendants did not articulate a reason for denying approval of the Lease assignment at the time.

[38] Transmax alleges it identified the Second Buyer in July 2017 and met with Defendants that same month. Transmax does not allege the specific date Defendants rejected assignment of the Lease to the Second Buyer. Pursuant to the discussion above, if this rejection occurred *after* July 31, 2017, Transmax has no claim as to the Second Buyer. But if it was *prior* to July 31, Transmax's claim is not barred. Since the Court does not know the precise date at this juncture, it will treat all interactions with the Second Buyer as occurring prior to July 31. If discovery proves otherwise, Defendants may reassert this argument as to the Second Buyer on a motion for summary judgment.

[39] ECF 16-1, at 9–14.

### 1. Transmax Is Not Required to Allege Defendants Discriminated Against It Because of Its Owner's Race.

Defendants argue Transmax's constitutional claims must be dismissed because they do not allege Defendants discriminated against Transmax based on *its* race. According to Defendants, Transmax only alleges racial discrimination against the First and Second Buyers based on *the potential buyers'* race.

While Defendants' assertions are factually correct, a civil rights claim nonetheless arises "when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship." *Domino's Pizza*, 546 U.S. at 476. That is precisely what Transmax alleges here—Defendants impaired the parties' existing contractual agreement (*i.e.*, the Lease) by refusing to approve an assignment to potential buyers because of their race. It is immaterial that Defendants' alleged discrimination was not directed at the race ascribed to Transmax. *E.g.*, *Gordon v. City of Cartersville*, 522 F. Supp. 753, 756 (N.D. Ga. 1981) ("[T]he caselaw . . . establishes conclusively that racial discrimination motivated by anti-black feeling but directed against whites is actionable" under §§ 1981 and 1982) (citing *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 236-37 (1969)); *Riccobono v. Whitpain Twp.*, 497 F. Supp. 1364, 1373 (E.D. Pa. 1980) (stating non-minority plaintiff had standing

under §§ 1981 and 1982 to recover against defendants whose racially motivated conduct directed at third-parties, who were members of minority groups, injured the non-minority plaintiff).

Contrary to Defendants' characterization, Transmax does not bring these claims to vindicate the potential buyers' rights to be free from racism. Instead, Transmax identifies a contract under which it has rights—the Lease—and articulates how Defendants' alleged racially motivated actions impinged *Transmax's* rights under that agreement. For example, Transmax alleges that, but for Defendants' discrimination, it could have sold the Business for hundreds-of-thousands of dollars. In sum, Transmax is not attempting to act as an agent for someone else's contracting, but is suing to enforce its own rights. Therefore, Transmax's allegations are sufficient to state a plausible claim at this stage.

### 2. Transmax's Claims Are Timely Under the Applicable Statute of Limitations.

Defendants argue Transmax's claims as to the First and Second Buyers are barred by the applicable statute of limitation. The parties disagree as to what limitations period controls. According to Defendants, the claims are governed by a two-year statute of limitation derived under Georgia law. Transmax, conversely, contends the claims are governed by the catch-all, four-year limitations period found in 28 U.S.C. § 1658.

Sections 1981 and 1982 do not contain limitations clauses. *Edwards v. Nat'l Vision Inc.*, 568 F. App'x 854, 860 (11th Cir. 2014). Prior to 1991, federal courts were required to apply "the most appropriate or analogous state statute of limitations" to such claims. *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 660 (1987). At that time, the Supreme Court narrowly interpreted § 1981 as "expressly prohibit[ing] discrimination only in the making and enforcement of contracts" and declined to construe § 1981 "as a general proscription of racial discrimination in all aspects of contract relations." *Patterson v. McLean Credit Union*, 491 U.S. 164, 176 (1989). In 1991, Congress amended § 1981 and broadly defined the term "make and enforce contracts" to include "the making, performance, modification, and termination of contacts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Claims made possible by the 1991 amendments are not controlled by any state statute of limitation, but are governed by the four-year period in 28 U.S.C. § 1658. *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004).

This leaves the following dichotomy: If Transmax's claims were cognizable prior to the 1991 amendments, then the state statute of limitation applies. *Edwards*, 568 F. App'x at 860. *See also Saunders v. Emory Healthcare, Inc.*, 360 F. App'x 110, 114 (11th Cir. 2010) ("Claims cognizable under § 1981 prior to the Civil Rights Act of

1991 are subject to the state statute of limitations for personal injury torts."). Under this scenario, the Georgia two-year limitations period for personal injury torts would apply. O.C.G.A. § 9-3-33; *Saunders*, 360 F. App'x at 114. But if Transmax's claims could only have been brought after the 1991 amendments, then the four-year period in § 1685 controls. *Edwards*, 568 F. App'x at 860.

As discussed above, Transmax alleges Defendants discriminatorily refused to approve the assignment of the Lease to the First and Second Buyers because of their race. Beyond merely the initial making and subsequent termination of a contract, these claims concern the ancillary issues of Defendants' performance of the "terms [ ] and conditions of the contractual relationship." 42 U.S.C. § 1981(b). The Court concludes that Transmax's claims as to the First and Second Buyers would not have been cognizable prior to the 1991 amendments. Thus, the four-year statute of limitations in § 1658 controls. According to the Amended Complaint, Defendants' discrimination as to the First and Second Buyers occurred in July 2016 and July 2017, respectively. Transmax initiated this action in August 2019. As such, the Court finds Transmax's claims are timely under § 1658 and not barred by the statute of limitation.

### 3. Transmax Alleges Sufficient Facts to State a Plausible Claim.

Defendants argue Transmax's constitutional claims must be dismissed because its allegations regarding an agreement with the First and Second Buyers are too speculative. For the First Buyers, Transmax alleges they were "willing and able to enter into a contract to purchase the business" for $180,000 "if allowed to take over the [L]ease."[40] Transmax and Defendants subsequently met with the First Buyers to "discuss the sale of the business and assignment of the [L]ease."[41] Transmax likewise alleges the Second Buyer was "interested in buying its business for $130,000 and willing and able to enter into a contract to purchase the business if allowed to take over the [L]ease."[42] Transmax and Defendants subsequently met with the Second Buyer regarding the potential sale.[43] Defendants rejected both potential buyers.

Defendants contend Transmax's allegations are too speculative and do not show "the existence of an actual agreement with any potential buyers of its business that was thwarted by Defendants' alleged refusal to permit

---

[40] ECF 13, ¶ 14.

[41] *Id.* ¶ 16.

[42] *Id.* ¶ 19.

[43] *Id.* ¶ 21.

assignment."[44] Defendants' argument is unavailing at the motion to dismiss stage. Transmax has stated a plausible claim that Defendants' actions impinged on its rights to sell the Business and assign the Lease under its terms.

Further, the existence of final agreements with the prospective buyers is not fatal to Transmax's claims. There is no requirement under §§ 1981 or 1982 that Transmax present a fully enforceable contract. *Ultimax Transp.*, 231 F. Supp. 2d at 1339 ("[N]othing in the language of Section 1981 requires that a written contract be in place before a party may assert a claim. . . . [I]n amending Section 1981 in the 1991 Civil Rights Act, Congress intended to expand the scope of Section 1981 to cover a broad spectrum of racial discrimination in all aspects of contractual relations."). *See also Andrews v. Lakeshore Rehab. Hosp.*, 140 F.3d 1405, 1411 (11th Cir. 1998) ("Other[ ] [courts] have cited the legislative history of the 1991 Act, replete with expressions of Congress's intent to broaden section 1981 specifically to cover race-based retaliation in all phases of contractual relations."). Such a rule would upend the very text of § 1981, which is broad and covers "all phases and incidents of the contractual relationship." *Rivers*, 511 U.S. at 302. *See also Dunkin' Donuts Franchised Rests. LLC v. Sandip, Inc.*, 712 F. Supp. 2d 1325, 1327 (N.D. Ga. 2010)

---

44   ECF 16-1, at 13.

("Section 1982 prohibits racial discrimination in actions related to real and personal property."). As such, Transmax has stated plausible claims with respect to the First Buyers and Second Buyer in Counts I and II.

### B.   Transmax's Breach of Contract Claims (Counts III–V)

Transmax alleges three independent claims for breach of contract against both Defendants for failure to approve the assignment of the Lease (Count III); failure to extend the Lease (Count IV); and the right of quiet enjoyment and bad faith breach (Count V). Defendants contend all three claims must be dismissed.

### i.   Choice of Law

The Court has federal question jurisdiction (28 U.S.C. § 1331) over Transmax's §§ 1981 and 1982 claims and supplemental jurisdiction (28 U.S.C. § 1367) over its state law claims. For the state law claims, the Court applies the choice of law rules of the state in which it sits. *BW Orchards, LLC v. Spiech Farms Ga., LLC*, No. 2:19-cv-00007, 2019 WL 2635541, at *9 (S.D. Ga. June 26, 2019) (citing *Best Canvas Prod. & Supplies, Inc. v. Ploof Truck Lines, Inc.*, 713 F.2d 618, 621 (11th Cir. 1983) ("A federal court is obliged to apply the choice of law rule of the state in which it sits.")). For contract cases, "Georgia follows the traditional rule of *lex loci contractus.*" *McGill v. Am. Trucking & Transp., Ins. Co.*, 77 F. Supp. 3d 1261, 1264 (N.D. Ga. 2015). Pursuant to this doctrine, "contracts are governed by

the law of the place where they were made." *Id*. A contract is "made" in "the place where the last act essential to the completion of the contract was done." *Shorewood Packaging Corp. v. Commercial Union Ins. Co.*, 865 F. Supp. 1577, 1578 (N.D. Ga. 1994). Here, the parties executed and signed the Lease in Georgia. The parties agree that Georgia law controls the dispute. As such, the Court applies Georgia law to Transmax's state law claims.

In Georgia, "[t]he essential elements of a breach of contract claim are (1) a valid contract; (2) material breach of its terms; and (3) damages arising therefrom." *Brooks v. Branch Banking & Tr. Co.*, 107 F. Supp. 3d 1290, 1295 (N.D. Ga. 2015). *See also Norton v. Budget Rent A Car Sys., Inc.*, 307 Ga. App. 501, 502 (2010) ("The elements for a breach of contract claim in Georgia are the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken."). A contracting party generally breaches a contract if it "repudiates or renounces liability under the contract; fails to perform the engagement as specified in the contract; or does some act that renders performance impossible." *UWork.com, Inc. v. Paragon Techns., Inc.*, 321 Ga. App. 584, 590 (2013).

### ii.   Transmax Cannot Hold Swartzberg Individually Liable for Any Breach of Contract.

Defendants argue all three breach of contract claims must be dismissed against Swartzberg individually because he was not a party to the Lease. As a

general rule "a non-party to a contract cannot breach that contract." *Uhlig v. Drayprop, LLC*, No. 4:11-cv-145, 2013 WL 5532883, at *5 (S.D. Ga. Oct. 4, 2013) (*citing UWork.com,* 321 Ga. App. at 592). *See also Gondolier Pizza Int'l, Inc. v. CRT Too, LLC*, No. 1:08-cv-01986-JEC, 2009 WL 3152183, at *11 (N.D. Ga. Sept. 29, 2009) ("[T]he general rule is that one who does not sign a contract is not bound by the contract's terms."); *Kaesemeyer v. Angiogenix, Inc.*, 278 Ga. App. 434, 437 (2006) ("It is axiomatic that a person who is not a party to a contract is not bound by its terms."). However, while "non-signatories are generally not bound by contracts, traditional principles of state law may allow a contract to be enforced by or against nonparties to the contract." *Cajun Glob. LLC v. Swati Enters., Inc.*, 283 F. Supp. 3d 1325, 1330 (N.D. Ga. 2017) (applying Georgia law).

In the Lease, Transmax is named as the "lessee" and RDA the "lessor."[45] While the Lease refers to Swartzberg at various points,[46] he is not listed as a party and did not sign the Lease.[47] Swartzberg subsequently signed two amendments to the Lease, but as a representative of RDA, not in his individual capacity.[48]

---

[45]   ECF 7-2, at 21.

[46]   For example, the Lease requires Transmax to mail all rent payments to Swartzberg and he is listed as RDA's managing member [*id*. at 7, 16].

[47]   *Id*. at 21.

[48]   *Id*. at 29 (first amendment), 31 (second amendment).

Swartzberg was not a named party to either amendment.[49] Transmax otherwise makes no allegations of an enforceable agreement between it and Swartzberg.

Transmax, nonetheless, contends Swartzberg may be personally liable for RDA's breach as its agent. Transmax alleges Swartzberg "acted with the knowledge and authority of [RDA], as an agent of [RDA]."[50] Transmax relies on theories of tort law holding that a corporate agent may, in certain circumstances, be personally liable.[51] But Transmax's claims arise out of contract law, not tort. With regard to contracts, Georgia law states that "[w]hen an agent acts for a disclosed principal, the agent is not liable for the principal's breach of contract." *Phillips v. Ocwen Loan Servicing, LLC*, 92 F. Supp. 3d 1255, 1267 (N.D. Ga. 2015) (citing O.C.G.A. § 10-6-53) ("The form in which the agent acts is immaterial; if the principal's name is disclosed and the agent professes to act for him, it will be held to be the act of the principal."). *See also Cuba v. Hudson & Marshall, Inc.*, 213 Ga. App. 639, 640 (1994) ("[E]ven if there were an enforceable contract for the sale of

---

49    *Id.*

50    ECF 13, ¶ 6. *See also id.* ¶ 7 ("[RDA] gave Swartzberg its agent, sole authority to manage The Railyard, including approving the leasing and assigning of units in The Railyard. Swartzberg agreed to and assumed such authority for landlord [RDA].").

51    ECF 17, at 13–14 (citing O.C.G.A. § 10-6-85; *Ramey v. Pritchett*, 90 Ga. App. 745, 753 (1954); *Owens v. Nichols*, 139 Ga. 475 (1913)).

Property No. 230, plaintiffs' remedy would be against [the principal]; defendants as agents of a disclosed principal would not be liable for the principal's breach of contract.").

As Transmax acknowledges, Swartzberg has always acted on behalf of a disclosed principal—RDA. Transmax points to no authority that could make Swartzberg liable under the Lease to which he is not a party. Therefore, Transmax cannot maintain its breach of contract claims (Counts III–V) against Swartzberg individually.

### iii.   RDA's Alleged Breaches of Contract

The Court addresses RDA's potential liability as to each breach of contract claim in turn.

### 1.   Breach of Contract for Failure to Assign the Lease (Count III)

Transmax alleges RDA breached the Lease by unreasonably withholding its consent to assign the Lease. As stated, Section 14 of the Lease expressly provided that RDA's "prior written consent . . . shall not be unreasonably withheld or delayed."[52] Thus, RDA maintained a contractual duty to not unreasonably withhold consent until the Lease expired on July 31, 2017.[53]

---

[52]   ECF 7-2, at 10.

[53]   As noted, the holdover provision of the Lease, while enforceable, did not alter

"Where a lease contains a clause requiring that such consent not be unreasonably withheld, a withholding of consent, which fails the test of fairness and commercial reasonableness, constitutes a breach of the lease." *WPD Ctr., LLC v. Watershed, Inc.*, 330 Ga. App. 289, 292 (2014). *See also Pakwood Indus., Inc. v. John Galt Assocs.*, 219 Ga. App. 527, 529 (1995) ("The primary factor courts have considered in determining the reasonableness of a lessor's refusal to consent is the financial ability of the proposed tenant to perform under the lease."). Issues of "reasonableness and unreasonableness" in the terms of a lease "are most often questions of fact requiring the consideration of the jury." *Stern's Gallery of Gifts, Inc. v. Corp. Prop. Inv'rs, Inc.*, 176 Ga. App. 586, 592–93 (1985).

Transmax alleges that, prior to July 31, 2017, it identified two potential buyers ready and willing to purchase the Business and assume its obligations under the Lease. However, Transmax alleges RDA withheld its consent to transfer the Lease because it did not want a Black tenant or tenant that primarily catered to Black clientele. Assuming the truth of these allegations, which the Court must do at this preliminary pleading stage, Transmax makes out a plausible claim that

---

the parties' month-to-month rental agreement or otherwise change Transmax's status as an at-will tenant after July 31, 2017. Transmax had no underlying right to assign its interests under the Lease after that date.

RDA breached the Lease by unreasonably withholding its consent to assign the Lease. As such, Count III may proceed against RDA.

### 2. Breach of Contract for Failure to Extend the Lease (Count IV)

Transmax alleges RDA breached the Lease by refusing to execute a third amendment with Transmax, thereby extending the term of the Lease beyond July 31, 2017. Specifically, Transmax alleges that, prior to the expiration of the Lease, the parties "verbally agreed" that Transmax would keep possession of the property in exchange for the monthly payment of rent.[54] Additionally, Transmax alleges the parties made a "series of verbal agreements" for RDA to extend the Lease in exchange for Transmax performing certain acts, such as paying its past-due rental amounts, late fees, and using its security guard to "monitor and report" on another tenant at The Railyard.[55]

Transmax relies on a series of alleged oral contracts, which "like written contracts . . . must be certain and definite in their terms." *Goldstein v. Kellwood Co.*, 933 F. Supp. 1082, 1087 (N.D. Ga. 1996) (citing *Pharr v. Olin Corp.*, 715 F. Supp. 1569, 1573 (N.D. Ga. 1989)). "Georgia law requires four foundational elements for the

---

[54]   ECF 13, ¶ 89.

[55]   *Id*. ¶¶ 55–56.

formation of a valid contract: (1) parties able to contract, (2) consideration, (3) definite subject matter, and (4) the assent of the parties to the terms of the contract." *APAC-Se., Inc. v. Coastal Caisson Corp.*, 514 F. Supp. 2d 1373, 1380 (N.D. Ga. 2007) (citing O.C.G.A. § 13–3–1; *Strait v. Reid*, 262 Ga. App. 430, 433 (2003)). An agreement to execute a lease is not enforceable "if the parties have not agreed to all of the essential terms and conditions of the lease." *OfficeMax, Inc. v. Sapp*, 132 F. Supp. 2d 1079, 1083 (M.D. Ga. 2001) (applying Georgia law). *See also Kreimer v. Kreimer*, 274 Ga. 359, 363 (2001) ("[T]he failure to agree to even one essential term [of a contract] means that there is no agreement to be enforced.").

Here, Transmax fails to allege that the parties came to an agreement on the length of any proposed extension. This is fatal to its claim, as the "duration of the lease is among the essential terms of a lease." *FC & J Props., L.P. v. McNeilus Fin., Inc.*, No. 3:09-cv-0144-CC, 2012 WL 13028223, at *4 (N.D. Ga. Sept. 10, 2012) (citing *Norris v. Downtown LaGrange Dev. Auth.*, 151 Ga. App. 343, 344 (1979)). *See also STC Two, LLC v. Shulman-Weiner*, 325 Ga. App. 245, 249 (2013) (citing *Smith v. Huckeba*, 232 Ga. App. 374, 375 (1998) ("[A] provision for the renewal of a lease must specify the terms and conditions of the renewal with such definite terms and certainty that the court may determine what has been agreed on, and if it falls short of this

requirement it is not enforceable. It must be certain and definite both as to the time the lease is to extend and the rent to be paid."). Since these alleged verbal contracts lacked this essential term, any agreement to extent the Lease beyond the parties' month-to-month arrangement after July 31, 2017 is unenforceable. Thus, Transmax cannot maintain this breach of contract claim against RDA.

### 3.    Breach of Contract for Quiet Enjoyment (Count V)

Transmax alleges RDA breached the Lease—as well as the implied right of quiet enjoyment—by intentionally obstructing Transmax's ability to run its business. Specifically, Transmax alleges that (1) in June 2018, Defendants began harassing and stalking Transmax and its employees because Defendants speculated Transmax was attempting to sell its business to potential buyers who were Black, and (2) Defendants obstructed the 2018 Labor Day party Transmax sought to host in the parking lot of The Railyard.

The Lease contained a covenant concerning the quiet enjoyment of the premises:

> Lessee, upon paying the rents herein reserved and performing and observing all other terms covenants and conditions of this lease on Lessee's part to be performed and observed, shall peaceably and quietly have, hold and enjoy the [property] during the term, subject, nevertheless to the terms of this lease and to any mortgages, ground or underling leases, agreements and

> encumbrances to which this lease is or may be subordinate.[56]

This provision is buttressed by Section 11 of the Lease, which states:

> Lessor and its agents, employees and independent contractors shall have the right to enter the [property] at reasonable hours to inspect and examine same, to make repairs, additions, alterations, and improvements . . . and to assure that Lessee is complying with all covenants and obligations of the lease.[57]

First, nothing in these provisions (or the entire Lease) provided Transmax any right to use The Railyard's parking lot to host a Labor Day party. The Lease covers only two suites in The Railyard itself. Transmax cannot sue for breach of contract to vindicate a right not provided for in the Lease.

Second, Transmax's reliance on the implied covenant of quiet enjoyment is equally unavailing. "A covenant for quiet enjoyment of the premises is necessarily implied in every lease." *Dwyer v. McCoy*, 236 Ga. App. 326, 329 (1999). However, this implied covenant is narrowly construed. "To constitute a breach of the covenant of . . . quiet enjoyment, an eviction or equivalent disturbance by title paramount must occur." *George v. Hercules Real Estate Servs., Inc.*, 339 Ga. App. 843, 850 (2016). The covenant only "goes to the extent of representing that the landlord

---

[56]   ECF 7-2, at 8.

[57]   *Id.*

has a *good title* and can give *a free and unencumbered lease* of the premises for the term stipulated." *Id*. (overturning line of cases that interpreted the covenant of quiet enjoyment to encompass non-title-based claims, such as constructive eviction) (emphasis in original). Here, Transmax's claim as to its ability to host the 2018 Labor Day party does not concern an eviction or RDA's title to The Railyard. As such, the implied covenant of quiet enjoyment does not cover this claim.

Finally, Transmax alleges RDA violated the quiet enjoyment provision in the Lease by harassing and stalking it and its employees. As stated, the Lease provided Transmax the right to "peaceably and quietly" enjoy the premises. Despite this, Transmax alleges RDA repeatedly harassed and stalked it. Accepted as true for purposes of Defendants' motion, these allegations state a plausible claim for relief. While RDA points to Section 11 of the Lease as giving it rights to enter the premises under certain circumstances, that provision does not give RDA the right to "harass" and "stalk," which allegations must be taken as true at this motion to dismiss stage. As such, Transmax has stated a plausible breach of contract claim in this regard.

### C.    Transmax's Remaining State Law Claims (Counts VI–IX)

In addition to its contract claims, Transmax alleges four state law claims against Defendants for unjust enrichment (Count VI); fraud (Count VII); tortious

interference with a contractual relationship (Count VIII); and tortious interference with a business relationship (Count IX). The Court addresses each in turn.

> ### *i.* Transmax's Unjust Enrichment (Count VI) Claim Must Be Dismissed.

Transmax alleges Defendants induced it to continue paying rent and late fees after the expiration of the Lease with the promise of extending the Lease, which Defendants never fulfilled. In Georgia, "[u]njust enrichment is an equitable concept and applies when as a matter of fact there is no legal contract, but when the party sought to be charged has been conferred a benefit by the party contending an unjust enrichment which the benefitted party equitably ought to return or compensate for." *Harris Ins. Agency, Inc. v. Tarene Farms, LLC*, 293 Ga. App. 430, 431 (2008) (citing *St. Paul Mercury Ins. Co. v. Meeks*, 270 Ga. 136, 137 (1998)). *See also Morris v. Britt*, 275 Ga. App. 293, 294 (2005) ("The concept of unjust enrichment in law is premised upon the principle that a party cannot induce, accept, or encourage another to furnish or render something of value to such party and avoid payment for the value received."). Put another way, "unjust enrichment is not a tort, but an alternative theory of recovery if a contract claim fails." *WESI, LLC v. Compass Envtl., Inc.*, 509 F. Supp. 2d 1353, 1363 (N.D. Ga. 2007) (citing *Tidikis v. Network for Med. Commc'ns & Research LLC*, 274 Ga. App. 807, 811 (2005)). To succeed, Transmax must prove: (1) it conferred a benefit on Defendants;

(2) Defendants had knowledge of the benefit; (3) Defendants accepted or retained the benefit conferred; and (4) the circumstances are such that it would be inequitable for Defendants to retain the benefit without paying for it. *Jenkins v. BAC Home Loan Servicing, LP*, 822 F. Supp. 2d 1369, 1377 (M.D. Ga. 2011) (citing *Baptista v. JPMorgan Chase Bank, N.A.*, 640 F.3d 1194, 1198 n.3 (11th Cir. 2011)) (applying Georgia law).

After the Lease expired, Transmax alleges the parties verbally agreed to "keep the rental rate at $7,500 per month for [Transmax] for as long as it leased the property."[58] In exchange for the right to continue leasing the property, Transmax assumed an obligation to make monthly payments to Defendants. Based on these allegations, Transmax's unjust enrichment claim arises out of a contract; a month-to-month rental arrangement establishing Transmax as a tenant at-will with no right of assignability after July 31, 2017. But Georgia law is clear that "unjust enrichment is available only when there is no legal contract." *Am. Casual Dining, L.P. v. Moe's Sw. Grill, L.L.C.*, 426 F. Supp. 2d 1356, 1372 (N.D. Ga. 2006) (citing *Camp Creek Hosp. Inns, Inc. v. Sheraton Franchise Corp.*, 139 F.3d 1396, 1413 (11th Cir. 1998); *Reg'l Pacesetters, Inc. v. Halpern Enters. Inc.*, 165 Ga. App. 777, 782

---

[58]   ECF 13, ¶ 89.

(1983)). The existence of contractual duties between the parties precludes an unjust enrichment claim. *Bogard v. Inter-State Assur. Co.*, 263 Ga. App. 767, 769 (2003). *See also Tidikis*, 274 Ga. App. at 811 ("[A]ny benefit conferred on the defendants was triggered by a provision in the contract . . . [u]nder these circumstances, the unjust enrichment claim fails as a matter of law."); *Bonem v. Golf Club of Ga., Inc.*, 264 Ga. App. 573, 578 (2003) ("A legal contract governs the dispute at issue here, and [plaintiff] may not rely on unjust enrichment."). Therefore, since Transmax's obligation to pay rent and late fees arose out of contract, it cannot support an unjust enrichment claim.[59]

### ii.   Transmax's Fraud Claim (Count VII) Must Be Dismissed.

Transmax alleges Defendants made knowing and intentional misrepresentations to induce Transmax to continue to lease the property after the expiration of the Lease. To succeed on its fraud claim, Transmax must prove: (1) a false representation by Defendants; (2) scienter; (3) intention to induce reliance;

---

[59]   Additionally, Transmax's unjust enrichment claim fails because it does not plausibly allege that it is an unfair advantage for Defendants to retain the rent payments made in exchange for granting Transmax permission to use the space. *See Sitterli v. Csachi*, 344 Ga. App. 671, 673 (2018) (citing *Morris v. Britt*, 275 Ga. App. 293, 294 (2005) ("[F]or unjust enrichment to apply, the party conferring the . . . things of value must act with the expectation that the other will be responsible for the cost. Otherwise, that party . . . has no right to an equitable recovery.")).

(4) justifiable reliance; and (5) damages. *Rosen v. Protective Life Ins. Co.*, No. 1:09-cv-03620 WSD, 2010 WL 2014657, at *5 (N.D. Ga. May 20, 2010) (citing *J.E. Black Constr. Co., Inc. v. Ferguson Enters., Inc.*, 284 Ga. App. 345, 346 (2007)). "As a general rule, actionable fraud cannot be based on statements and promises as to future events." *Edwards v. Cent. Ga. HHS, Inc.*, 253 Ga. App. 304, 305 (2002) (citing *Ely v. Stratoflex, Inc.*, 132 Ga. App. 569, 571 (1974)). *See also Vernon v. Assurance Forensic Accounting, LLC*, 333 Ga. App. 377, 390 (2015) ("The general rule is that actionable fraud cannot be predicated upon promises to perform some act in the future. Nor does actionable fraud result from a mere failure to perform promises made. Otherwise, any breach of a contract would amount to fraud.") (citing *Jonas v. Jonas*, 280 Ga. App. 155, 159 (2006)); *Alston v. Brown Transp. Corp.*, 182 Ga. App. 632, 632 (1987) ("Actionable fraud cannot be based on statements and promises as to future events.").

All of Transmax's allegations are based on promises to perform certain future acts. For example, Transmax alleges Defendants promised they would (1) renew/extend the Lease; (2) reimburse Transmax for the use of its security guard; and (3) permit Transmax to have its 2018 Labor Day party.[60] These fraud

---

[60]   ECF 13, ¶¶ 113–15.

claims premised on promises of future acts not fulfilled are barred by Georgia law. As Transmax notes, there is an exception to this general rule "where a promise as to future events is made with a present intent not to perform or where the promisor knows that the future event will not take place." *Vernon*, 333 Ga. App. at 390. However, "[s]ome evidence (beyond the mere failure to perform) must support a finding that the promise was made with a present intent not to perform." *Id.* Transmax fails to even allege that Defendants acted with the present intent not to perform any of these future promises. As such, Transmax does not allege a plausible claim for fraud. *Iqbal*, 556 U.S. at 678.

### iii.   Transmax's Claims for Tortious Interference with Contractual and Business Relationships (Counts VIII and IX) Must Be Dismissed.

Transmax alleges Defendants interfered with its contract and business relationships with various unnamed, third-party manufacturers, promoters, and vendors. Specifically, Transmax premises its interference claims on Defendants' alleged obstruction of its ability to have a Labor Day Party in 2018. Defendants contend both claims are barred by Georgia's "stranger doctrine."

In Georgia, the elements for a tortious interference with contract claim are:

> (1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure; (3) the defendant induced a breach of a contractual

> obligation or caused a party or third party to discontinue
> or fail to enter into an anticipated business relationship
> with the plaintiff; and (4) the defendant's tortious
> conduct proximately caused damage to the plaintiff.

*Culpepper v. Thompson*, 254 Ga. App. 569, 571 (2002) (citing *Disaster Svcs. v. ERC P'ship*, 228 Ga. App. 739, 740 (1997)).

While containing similar elements, a claim for "[t]ortious interference with business relations is a distinct and separate tort from that of tortious interference with contractual relations." *Renden, Inc. v. Liberty Real Estate Ltd. P'ship III*, 213 Ga. App. 333, 334 (1994). For a business relationship claim, Transmax must prove Defendants "(1) acted improperly and without privilege, (2) acted purposely and with malice with the intent to injure, (3) induced a third party or parties not to enter into or continue a business relationship with the plaintiff, and (4) caused plaintiff financial injury." *Looney v. M-Squared, Inc.*, 262 Ga. App. 499, 504 (2003) (citing *Renden*, 213 Ga. App. at 334).

To establish the first element of both claims—that Defendants acted without privilege—Transmax "must show that [Defendants were] stranger[s] to the contract or business relation at issue." *Mabra v. SF, Inc.*, 316 Ga. App. 62, 64 (2012) (citing *ASC Constr. Equip. USA, Inc. v. City Com. Real Estate, Inc.*, 303 Ga. App. 309, 313 (2010)). This rule—commonly referred to as the "stranger doctrine"—provides that "only a stranger to both the contract at issue and the business relationship

giving rise to and underpinning the contract may be liable for tortious interference with the contract or the relationship." *Mabra*, 316 Ga. App. at 64–65 (citing *Atlanta Market Ctr. Mgmt. Co. v. McLane*, 269 Ga. 604, 608–10 (1998); *Perry Golf Course Dev., LLC v. Housing Auth. of Atlanta*, 294 Ga. App. 387, 390 (2008)). *See also BMC-The Benchmark Mgmt. Co. v. Ceebraid-Signal Corp.*, No. 1:05-cv-1149-WSD, 2007 WL 2126272, at *7 (N.D. Ga. July 23, 2007) ("The plaintiff's burden includes showing that the defendant was a 'meddler,' 'interloper,' or 'stranger' to the contract or business relationship underlying the contract.").

This inquiry focuses not on "whether the defendant is a party to the contract or relationship, but whether he has a direct economic interest in or would benefit from a contract with which he is alleged to have interfered." *Feldman v. Am. Dawn, Inc.*, No. 1:14-cv-3006-LMM, 2015 WL 11439174, at *10 (citing *Mabra*, 316 Ga. App. at 64–65). *See also BMC*, 2007 WL 2126272, at *8 ("Where appropriate circumstances appear from the evidence that a defendant had a legitimate interest in either the contract or a party to the contract, the defendant is not a stranger to the contract.") (citing *Disaster Servs.*, 228 Ga. App. at 741); *Atlanta Mkt. Ctr.*, 269 Ga. at 608 ("One is not a stranger to the contract just because one is not a party to the contract.").

To reiterate, Swartzberg owns RDA, which owns The Railyard—including the suites leased by Transmax and the parking lot on which Transmax sought to

throw its 2018 Labor Day Party. Transmax alleges that, "per the [L]ease and the parties' subsequent agreement, [Transmax] had a right to throw a Labor Day Party in the Parking Lot of the property."[61] Transmax alleges that it received approval from Defendants in June 2018 to hold the Labor Day party.[62] Even assuming the truth of these allegations, Transmax's tortious interference claims are barred by the stranger doctrine. While neither Defendant was a party to the alleged contracts or business relationships between Transmax and the third parties, RDA had a *bona fide* economic interest in an event being held on its property. Swartzberg's economic interest derives from his ownership of RDA. As Transmax's allegations indicate, Defendants are not strangers to these agreements; Transmax was required to obtain Defendants' express approval before planning the event. Transmax's reliance on *Tap Room, Inc. v. Peachtree Tsg Assocs., LLC* is inapposite, as that court did not discuss the stranger doctrine and actually granted summary judgment in the defendant's favor on the plaintiff's tortious interference claim because the defendant "properly withheld its consent to the assignment under the privilege created by the lease" and "[t]here can be no liability for interference with business relations when the alleged interference is caused by the exercise of an

---

[61]  *Id*. ¶ 99.

[62]  *Id*. ¶ 58.

absolute right." 270 Ga. App. 90, 92 (2004). Transmax cannot maintain its tortious interference claims.

## IV.   CONCLUSION

Defendants' motion to dismiss [ECF 13] is **GRANTED IN PART and DENIED IN PART**. Counts I and II are **DISMISSED** as to all claims except those relating to the First Buyers and Second Buyer. Counts III and V are **DISMISSED** against Swartzberg individually. Counts IV and VI–IX are **DISMISSED** in their entirety. Transmax may proceed with the remaining claims of Counts I and II against both Defendants, and with Counts III and V solely against RDA.

Within 21 days after entry of this Order, Defendants shall file their Answers to the remaining portions of the Amended Complaint. Within 30 days after entry of this Order, the parties shall file an amended joint proposed preliminary report and scheduling order. Discovery shall commence 30 days after Defendants file their Answers.

**SO ORDERED** this the 28th day of August 2020.

_____
Steven D. Grimberg
United States District Court Judge